UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ALFONSO RIZZUTO,

Plaintiff,

- against -

LYNN J. LILLEY, ASHLEY T. HARRIS-BAKER and MIRIAM WEIG,

Defendants.
-----------------------------------------------------------x

**OPINION & ORDER**

No. 22-CV-7698 (CS)

Appearances:
Alfonso Rizzuto
Duryea, Pennsylvania
*Pro Se Plaintiff*

Elizabeth Barbanes
Assistant Attorney General
Office of the Attorney General of the State of New York
White Plains, New York
*Counsel for Defendants*

Seibel, J.

Before the Court is Defendants' motion for summary judgment. (ECF No. 79.) For the following reasons, the motion is GRANTED.

## I. BACKGROUND

The following facts are based on Defendants' Local Civil Rule ("L.R.") 56.1 Statement (ECF No. 82 ("Ds' 56.1 Stmt.")), Plaintiff's response to Defendants' L.R. 56.1 Statement, (ECF No. 89 ("P's 56.1 Stmt.")), and the supporting materials, and are undisputed unless otherwise noted.[1]

[1] Several of Plaintiff's responses to Defendants' 56.1 Statement improperly interject arguments, add facts, or deny Defendants' statements without citing to admissible evidence,

**A. <u>Facts</u>**

Plaintiff Alfonso Rizzuto was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Woodbourne Correctional Facility ("Woodbourne") in Woodbourne, New York from May 28, 2019 to October 16, 2019. (Ds' 56.1 Stmt. ¶¶ 1-2; ECF No. 86-2 ("P's Depo.") at 25:15-26:2.) Plaintiff brings this lawsuit pursuant to 42 U.S.C. § 1983 against Defendants Ashley Harris-Baker, Miriam Weig, and Lynn Lilley, all of whom worked at Woodbourne during the relevant period. (ECF No. 40 ("AC") at 9-11, 13-14.)[2] Harris-Baker served as a Physician's Assistant ("PA") in the Health Services Unit, (Ds' 56.1 Stmt. ¶ 3; ECF No. 85 ("Harris-Baker Decl.") ¶¶ 1-2); Weig is a Registered Nurse ("RN") and was the Acting Nurse Administrator, (Ds' 56.1 Stmt. ¶ 4; ECF No. 83 ("Weig Decl.") ¶¶ 1-3); and Lilley was the Superintendent, (Ds' 56.1 Stmt. ¶ 5; ECF No. 84 ("Lilley Decl.") ¶ 1). Weig did not directly supervise Harris-Baker or have the authority to direct the latter's care of Plaintiff. (Ds' 56.1 Stmt. ¶ 4; Weig Decl. ¶ 6.)[3]

---

(*e.g.*, P's 56.1 Stmt. ¶¶ 6, 23, 27, 29, 54), and I therefore disregard these responses to that extent, *see Ward v. Nassau Cnty.*, No. 15-CV-4309, 2023 WL 5417329, at *1 (E.D.N.Y. Aug. 22, 2023) ("A party may not rest on a mere denial without citing supporting admissible evidence."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (improper to "interject[] arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding responses that "do not specifically dispute Defendants' statements or consist of conclusory allegations, speculation or conjecture"). (Unless otherwise indicated, all case quotations omit internal citations, quotation marks, alterations and footnotes. My chambers will send Plaintiff copies of any unreported decisions cited in this Opinion and Order.)

[2] Citations to the AC use the page numbers generated by the Court's Electronic Case Filing ("ECF") system.

[3] Although Plaintiff did not dispute this fact in his response to Defendants' L.R. 56.1 Statement, (*see* P's 56.1 Stmt. ¶ 4), he seems to attempt to dispute it in his declaration, stating, "[Weig] never makes the claim that she has no responsibility to oversee Harris-Baker's care for me." (ECF No. 90 ("Rizzuto Decl.") ¶ 14.) This is not the only instance of Plaintiff disputing a fact in his declaration instead of his 56.1 Statement. (*See e.g.*, *id.* ¶ 11, 25.) Because Plaintiff is

### 1. Plaintiff's Medical History

Plaintiff has a "documented history of plaque psoriasis," (Ds' 56.1 Stmt. ¶ 6; P's 56.1 Smt. ¶ 6; *see* ECF No. 87-1 ("2016 Bellevue Consultation")), among numerous other health conditions, (Ds' 56.1 Stmt. ¶ 7; P's 56.1 Stmt. ¶ 7). Additionally, Defendants claim that Plaintiff has several food allergies but refused to follow his prescribed allergen-free diet. (Ds' 56.1 Stmt. ¶ 8; ECF No. 87-6 ("AHR Notes and Records") at 23, 58, 62, 63.)[4] Plaintiff states, without presenting documentary evidence in support, that further testing at another facility showed that he had none of these allergies. (P's 56.1 Stmt. ¶ 8; Rizzuto Decl. ¶ 6.)

#### a. June 2016 Bellevue Dermatology Consultation

On June 7, 2016, Plaintiff was evaluated at the Bellevue Hospital Center Dermatology Ambulatory Care Clinic. (Ds' 56.1 Stmt. ¶ 9; 2016 Bellevue Consultation.) The consultation report stated that Plaintiff's psoriasis was "well controlled," and established the following treatment plan: (1) Cetaphil lotion, twenty ounces per week; (2) mineral oil, sixteen ounces per week; (3) hydrocortisone 1% cream, applied twice daily as needed, up to one a week at a time; (4) clobetasol ointment 0.05%, applied twice daily as needed, up to two weeks at a time; (5) fluocinolone 0.005% solution, applied daily as needed; (6) tar shampoo, one to two times

---

a *pro se* litigant, "the Court will consider the totality of [his] submissions in identifying disputed material facts and will construe those disputed facts in [P]laintiff's favor as is appropriate on summary judgment." *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07-CV-8835, 2008 WL 5110976, at *1 n.2 (S.D.N.Y. Dec. 2, 2008). But the Court disregards this particular dispute, as it sees no material difference between (a) having no responsibility for Harris-Baker's care of Plaintiff, and (b) not being Harris-Baker's direct supervisor and not having the authority to direct her care of Plaintiff. Indeed, under New York law, medical services performed by a PA, such as Harris-Baker, must be supervised by a physician, not an RN. *See* N.Y. Educ. Law § 6542(1). Further, as discussed below, the outcome here would be the same if Weig were Harris-Baker's direct supervisor.

[4] Citations to the AHR Notes and Records use the page numbers generated by the Court's ECF system.

weekly; (7) Vaseline, aquaphor, or A&D ointment, twice daily to the body; (8) Dove soap; (9) hydroxyzine twenty-five milligrams; (10) alcohol pads as needed, per "patient request[]"; (11) hypoallergenic laundry detergent; (12) skin brush for shower use; and (13) at least ten minutes of daily sun exposure three times weekly. (Ds' 56.1 Stmt. ¶¶ 11, 12; 2016 Bellevue Consultation.) Plaintiff notes that this treatment plan kept his psoriasis "under control." (Rizzuto Decl. ¶ 8.)

b. July 2019 Dr. Miranda Dermatology Consultation

On May 28, 2019, Plaintiff was transferred to Woodbourne. (Ds' 56.1 Stmt. ¶ 24; P's Depo. at 25:15-19.) On June 3, 2019, Harris-Baker referred Plaintiff to Dr. Miranda for a dermatology follow-up, which occurred on July 10, 2019. (Ds' 56.1 Stmt. ¶ 25; Harris-Baker Decl. ¶ 12; ECF No. 87-4 ("2019 Miranda Consultation").) Dr. Miranda recommended the following psoriasis treatments: (1) Cetaphil lotion, sixteen ounces weekly, applied daily; (2) mineral oil, sixteen ounces weekly; (3) Hydrocortisone ointment 2.5%; (4) Fluocinonide ointment 0.05%, two tubes weekly; (5) Vitamin E lotion, eight ounces weekly; (6) Fluocinonide solution 0.05%; (7) Benadryl twenty-five milligrams; (8) Bacitracin ointment; and (9) clobetasol ointment 0.05%, forty-five grams every two weeks, applied twice daily. (Harris-Baker Decl. ¶¶ 19-20; AHR Notes and Records at 61.)[5] Woodbourne received this list on July 15, 2019. (Ds' 56.1 Stmt. ¶ 28.)

[5] Dr. Miranda also recommended emollients such as petroleum jelly, as well as other medications for unrelated conditions. (*See* Harris-Baker Decl. ¶ 19; AHR Notes and Records at 61.)

### 2. Medical Care at Woodbourne

a. Harris-Baker

Plaintiff claims that Harris-Baker's failure to properly implement his doctors' recommended treatments worsened his psoriasis and caused "scars, infections, and continued pain and suffering." (Rizzuto Decl. ¶ 7; *see id.* ¶¶ 9, 11; AC at 10-11.)

On June 3, 2019, Harris-Baker submitted a non-formulary drug request for clobetasol ointment 0.05%, twice daily for up to two weeks at a time with a three-month supply, which was approved by the DOCCS Regional Medical Director ("RMD") on June 5, 2019. (Ds' 56.1 Stmt. ¶¶ 29, 30; Harris-Baker Decl. ¶ 13.)[6] After Dr. Miranda recommended an increased clobetasol dosage, Harris-Baker submitted a revised non-formulary request on July 29, 2019 for the recommended dosage, (Ds' 56.1 Stmt. ¶ 31; Harris-Baker Decl. ¶ 20(a)), which the RMD approved the same day, (Ds' 56.1 Stmt. ¶ 32). Clobetasol was dispensed to Plaintiff pursuant to these approvals. (*Id.* ¶ 33; AHR Notes and Records at 42.)

On or about June 6-7, 2019, Harris-Baker submitted a non-formulary request for Cetaphil lotion, sixteen ounces weekly. (Ds' 56.1 Stmt. ¶ 34; Harris-Baker Decl. ¶ 14.) The RMD returned this request, pending a statement of the clinical rationale distinguishing Cetaphil from formulary alternatives. (Ds' 56.1 Stmt. ¶ 35.) On July 29-30, 2019, Harris-Baker submitted two additional non-formulary requests for Cetaphil, (*id.* ¶ 36; Harris-Baker Decl. ¶ 20(b)), which the RMD approved on August 1, 2019, and Plaintiff received the medication pursuant to the approvals, (Ds' 56.1 Stmt. ¶¶ 37, 38).

---

[6] Harris-Baker does not have "authority to prescribe medications that fall outside the DOCCS formulary." (Harris-Baker Decl. ¶ 5.) Non-formulary medications require a separate written request that is either approved or denied by the RMD. (*Id.*)

On July 22, 2019, Harris-Baker prescribed Fluocinonide ointment 0.05%, fifteen grams, in a quantity of thirty grams every two weeks, with five refills. (*Id.* ¶ 39.) On August 30, 2019, she prescribed Hydrocortisone 2.5% ointment, thirty grams, with two refills. (*Id.* ¶ 40.) On September 17, 2019, she prescribed white petrolatum, twelve units, with two refills. (*Id.* ¶ 44.) On October 18, 2019, she prescribed Benadryl twenty-five milligrams, thirty tablets, with five refills. (*Id.* ¶ 45.) Harris-Baker also prescribed econazole cream, Tucks pads and rubbing alcohol pads. (*Id.* ¶ 48.) In October 2019, in response to an inquiry from Plaintiff, Weig wrote to him that Harris-Baker had switched Plaintiff's prescription from alcohol pads to ten Tucks pads because the latter were "more soothing." (ECF No. 83-1 ("Weig Decl. Exs.") at 20.)[7]

On or about June 6-7, 2019, Harris-Baker submitted a non-formulary request for mineral oil, (Ds' 56.1 Stmt. ¶ 49; Harris-Baker Decl. ¶ 15), which the RMD denied, (Ds' 56.1 Stmt. ¶ 50). On July 29-30, 2019, Harris-Baker submitted a second non-formulary request for mineral oil, (*id.* ¶ 51; AHR Notes and Records at 2), which the RMD denied again, stating "Denied. Not allowable in facilities (Security risk)," (Ds' 56.1 Stmt. ¶ 52; AHR Notes and Records at 3). Neither denial was within Harris-Baker's authority to override. (Ds' 56.1 Stmt. ¶ 53.) Plaintiff was also receiving multiple alternative emollient preparations addressing the same objective as mineral oil, including Cetaphil, white petrolatum and petroleum jelly. (*Id.* ¶ 54.)[8]

Plaintiff also received medications recommended by Dr. Miranda that were within the DOCCS formulary, including fluocinonide solution, Aldara, Zovirax, Benadryl and Bacitracin,

---

[7] Citations to Weig Decl. Exs. use the page numbers generated by the Court's ECF system.

[8] Plaintiff does not dispute this fact but claims these items are "not an exact substitute" for mineral oil. (P's 56.1 Stmt. ¶ 54.)

(Harris-Baker Decl. ¶ 21), as well as medications prescribed by Harris-Baker for several other non-psoriasis conditions, (D's 56.1 Stmt. ¶¶ 41-43, 47).

In Plaintiff's L.R. 56.1 Statement, he does not dispute the above-mentioned facts. (*See* P's 56.1 Stmt. ¶¶ 29-59.) In his declaration, however, Plaintiff claims that Harris-Baker did not implement all of the dermatologists' recommendations and provided "miniscule" treatment amounts. (Rizzuto Decl. ¶ 10.) In support, Plaintiff cites his July 25, 2019 letter to Harris-Baker, in which he stated his psoriasis was "out of control" and requested the following treatments: (1) clobetasol 0.05%, two tubes per week, ten refills; (2) fluocinonide 0.05% two tubes per week, ten refills; (3) hydrocortisone 2.5% one tube per week, ten refills; (4) moisturizer, two jars per week, ten refills; (5) vitamin E lotion, two bottles per week, ten refills; (6) petroleum jelly, four tubes per week, ten refills; (7) alcohol pads, twenty per day; (8) Tucks pads, one jar per week; (9) a different kind of "pumi bar"; and (10) Neutrogena soap, one bar per week. (ECF No. 90-1 ("Ex. 1 Grievance") at 4-6; *see* Rizzuto Decl. ¶ 10.)[9] During his deposition, Plaintiff stated that Harris-Baker failed to provide alcohol pads and "[t]he five Tucks that she gave [him] per day" were not enough. (P's Depo. at 39:21-40:5.)[10] When shown prescriptions Harris-Baker submitted for various treatments, he replied that he "wasn't getting everything that [he] was prescribed," (*id.* at 80:16-81:3), but did not provide details or say to whom that failure was attributable.

---

[9] Citations to the Ex. 1 Grievance use the page numbers generated by the Court's ECF system.

[10] Elsewhere Plaintiff testified that he was only getting "a couple" of Tucks pads. (*Id.* at 84:13-15, 85:4-13.) Weig's memorandum to Plaintiff states that he was provided ten Tucks pads. (Weig Decl. Exs. at 20.) It is not clear that the Tucks were for psoriasis, but the Court will assume they were.

b. Weig

Plaintiff also claims that Weig violated his Eighth Amendment rights because she ignored his letters about Harris-Baker's medical care. (AC at 10-11.) Plaintiff sent Weig complaints about his prescriptions and misplaced medical records. (Ds' 56.1 Stmt. ¶ 65; Weig Decl. ¶¶ 11-12.) Weig responded to each letter by conveying information and decisions made by medical staff, stating certain requested items were available, informing him that his consult information was in his medical record, and conveying that his providers had modified orders in accordance with their medical judgment, availability of items, alternatives available, and security concerns. (Weig Decl. ¶¶ 12-13.) Defendants state that the record demonstrates that the information available to Weig when she received Plaintiff's communications showed that the dermatological recommendations were being implemented. (Ds' 56.1 Stmt. ¶ 68.) Plaintiff disputes this fact, claiming that Weig failed to meaningfully review the records showing Harris-Baker's failure to properly prescribe his treatments. (P's 56.1 Stmt. ¶¶ 68-69.)

**3. Water Quality at Woodbourne**

a. Lilley

Plaintiff claims that Woodbourne's contaminated water worsened his psoriasis, causing infections and his skin to become discolored and painful. (Rizzuto Decl. ¶ 25; ECF Nos. 90-5, 90-6.) In 2019, testing of the facility's water revealed elevated lead and copper levels. (Ds' 56.1 Stmt. ¶ 74; ECF No. 84-1 ("Water Report") at 4.)[11] Upon learning the results, Lilley engaged the New York State Department of Health ("NYSDOH") and undertook remedial measures. (Ds'

[11] Citations to the Water Report use the page numbers generated by the Court's ECF system.

56.1 Stmt. ¶ 75; Lilley Decl. ¶ 6.)[12] The NYSDOH never advised the facility that its water supply was unsafe or directed inmates to be so advised. (Ds' 56.1 Stmt. ¶ 76; Lilley Decl. ¶ 10.)

On August 7, 2019, the facility's executive team, including Lilley, attended an Inmate Liaison Committee ("ILC") meeting. (Ds' 56.1 Stmt. ¶ 78.)[13] The meeting minutes reflect that Lilley advised the inmates as to the water quality issues, the remedial steps being taken, and the status of the facility's coordination with NYSDOH. (*Id.*; ECF No. 84-2 ("ILC Meeting Minutes").) Lilley advised that there was no directive to not drink the water and discussed the timeline for installing a new injection system, what chemicals would be injected and why, and new required testing procedures. (ILC Meeting Minutes.)

Plaintiff claims that although Lilley said during the ILC meeting that there was no directive not to drink the water, he soon thereafter "quite candidly" told Plaintiff and others that he himself would not, and that he posted a letter stating not to drink the water but instead to buy it at the commissary. (Rizzuto Decl. ¶ 20; P's Depo. at 41:13-18.) During the relevant period, bottled water was available for purchase through the commissary, (Ds' 56.1 Stmt. ¶ 79), but Plaintiff states he was unable to exceed the purchase limit of two or three gallons every two weeks, (Rizzuto Decl. ¶ 25; P's Depo. at 99:9-11).

---

[12] Plaintiff attempts to dispute this fact, claiming that Lilley learned of the results on or before May 9, 2019, but did not do anything about it until the inmates demanded to see the Water Report in August 2019. (Rizzuto Decl. ¶ 18.) But this appears to be a mistake on Plaintiff's part. He relies on an exhibit, dated May 9, 2019, which is a cover memo for the transmission of the Annual Drinking Water Quality Report from the "Deputy Superintendent for Administration" to "All Staff and Inmate Population." (ECF No. 90-2.) But the Water Report indicates that the samples showing elevated levels of copper and lead were from June 2019, (Water Report at 4), and it includes other test results for the period up to January 2020, (*see id.* at 29), so that report could not have been prepared and conveyed until 2020. The report conveyed via the May 9, 2019 memorandum likely was the annual water report covering 2018.

[13] The ILC is a body through which the facility administration communicates directly with the incarcerated population regarding institutional concerns. (*Id.* ¶ 77.)

Plaintiff emphasizes that the Water Report advises that "[i]mmune-compromised persons . . . can be particularly at risk from infections. These people should seek advice from their health care provider about their drinking water." (Rizzuto Decl. ¶ 23; Water Report at 6.) Plaintiff also states that "[i]t is common knowledge" that elevated lead levels in water can exacerbate psoriasis. (P's 56.1 Stmt. ¶ 81.)[14] In support, Plaintiff cites an article stating that water with elevated levels of "[l]ead, iron, and other metals . . . can certainly trigger or exacerbate a flare for people" with psoriasis. (*See* Shower Water and Skin Health at 3.) Moreover, Plaintiff claims the sinks were blue from the chlorine that the facility used to combat pollutants, and chlorination can cause psoriasis sufferers to experience adverse reactions. (*E.g.*, P's Depo. at 36:6-7, 42:25, 98:8-20, 107:16-18; *see* Rizzuto Decl. ¶ 22; Chlorine and Psoriasis at 2-3.) Finally, Plaintiff notes that the water's pH balance ranged between 6 and 7.3 from February 2019 to January 2020,[15] and states, without citation, that a pH of 6.0 is "borderline undrinkable." (Rizzuto Decl. ¶ 24.)

**B. Procedural History**

Plaintiff filed his *pro se* complaint on September 7, 2022. (ECF No. 2.) There were difficulties effecting service on some Defendants, but all had been served by December 27, 2023. (*See* ECF Nos. 10-14, 17-19, 20, 32, 33.) On January 17, 2024, Defendants filed a pre-motion letter in anticipation of their motion to dismiss. (ECF No. 35.) The Court held a pre-motion

[14] Plaintiff cites Exhibit 4, an article discussing the harms of chlorine on psoriasis. (*See* ECF No. 90-4 ("Chlorine and Psoriasis").) (Citations to Chlorine and Psoriasis use the page numbers generated by the Court's ECF system.) It appears Plaintiff meant to cite Exhibit 3, which discusses the negative impact on individuals with psoriasis of metals, such as lead, in water. (ECF No. 90-3 ("Shower Water and Skin Health") at 3).) (Citations to Shower Water and Skin Health use the page numbers generated by the Court's ECF system.)

[15] In Plaintiff's declaration, he states the range is from February 2019 to January 2019. (Rizzuto Decl. ¶ 24.) The Court assumes Plaintiff meant February 2019 to January 2020. The Water Report includes pH levels for that period. (Water Report at 9-29.)

conference on March 4, 2024, at which it granted Plaintiff leave to amend his complaint. (Minute Entry dated Mar. 4, 2024.) On April 18, 2024, Plaintiff filed an amended complaint, (ECF No. 40), which Defendants moved to dismiss on July 15, 2024, (ECF No. 43).

On January 28, 2025, the Court issued a bench ruling granting the motion in part and denying it in part. (Minute Entry dated Jan. 28, 2025.) The Court denied the motion as to Plaintiff's Eighth Amendment claims against Harris-Baker and Weig regarding his skin condition, and against Lilley regarding the water quality. (*Id.*) At the conference, the Court also entered a discovery plan and scheduling order. (*Id.*; ECF No. 50.) On February 5, 2025, Defendants filed their answer. (ECF No. 52.)

On September 26, 2025, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 65.) The Court held a conference on October 9, 2025, at which it set a briefing schedule for Defendants' motion, (Minute Entry dated Oct. 9, 2025), which was extended three times, (ECF Nos. 70, 72, 74). The instant motion followed.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) ("When considering a motion for summary

judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for

purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). The Court construes Plaintiff's submissions "liberally" and "interpret[s] them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, "[a] *pro se* party's bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Walker v. Vaughan*, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002).

## III. DISCUSSION

Plaintiff advances a claim for deliberate indifference to serious medical needs against Harris-Baker and Weig based on his psoriasis treatment, and a claim for deliberate indifference to conditions of confinement against Lilley based on Woodbourne's water, both arising under the Eighth Amendment.

### A. Eighth Amendment Claim: Medical Needs

The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But "not every lapse in medical care is a constitutional wrong," and "a prison official violates the Eighth Amendment only when two requirements" – one objective and one subjective – "are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).

First, the prisoner must prove, objectively, that he was "actually deprived of adequate medical care[,] . . . [as] the prison official's duty is only to provide reasonable care," *id.* (citing

*Farmer*, 511 U.S. at 844-47), and "that the alleged deprivation of medical treatment [wa]s . . . sufficiently serious – that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005). "If the deprivation at issue is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's underlying medical condition is sufficiently serious." *Walker v. Clemson*, No. 11-CV-9623, 2012 WL 2335865, at *5 (S.D.N.Y. June 20, 2012), *report and recommendation adopted*, 2012 WL 3714449 (S.D.N.Y. Aug. 28, 2012). "If, however, the deprivation is in the degree or quantity of medical treatment actually given, the seriousness inquiry is narrower" and considers "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Id.*

Second, the prisoner must prove, subjectively, that the charged official acted with a sufficiently culpable state of mind. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence . . . [but] it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). The inmate must prove that the charged official knew of and disregarded "an excessive risk to inmate health or safety; the official must [have] both be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . must also [have] draw[n] the inference." *Johnson*, 412 F.3d at 403; *see Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (*per curiam*) (equating "deliberate indifference" with criminal "recklessness").

"It is well-established that [neither] mere disagreement over the proper treatment," *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998), nor "[m]edical malpractice . . . become

a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Rather, to state an Eighth Amendment deliberate indifference claim, an inmate "must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result." *Farid v. Ellen*, 593 F.3d 233, 248 (2d Cir. 2010). "[P]rison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

**1. Harris-Baker and Weig: Psoriasis Treatment**

Plaintiff does not satisfy the objective element. Defendants do not dispute that chronic plaque psoriasis constitutes a serious medical condition, but instead correctly contend that that is not the question; rather, the issue is whether there is a material difference between the treatment Plaintiff received and the treatment he reasonably should have received, and if so, whether that difference resulted in a sufficiently serious deprivation. (*See* ECF No. 81 ("Ds' Mem.") at 10.)

Harris-Baker promptly referred Plaintiff for a dermatological consultation upon his arrival at Woodbourne. (Ds' 56.1 Stmt. ¶¶ 24-25; Harris-Baker Decl. ¶ 12.) She also promptly submitted non-formulary requests for clobetasol, Cetaphil and mineral oil. (Ds' 56.1 Stmt. ¶¶ 29-30, 34-37; Harris-Baker Decl. ¶¶ 13-16.) After the consultation with Dr. Miranda, she updated the non-formulary requests and arranged for the formulary medications, prescribing Fluocinonide ointment 0.05%, Hydrocortisone ointment 2.5%, white petrolatum, Bacitracin, Benadryl, econazole cream, rubbing alcohol pads and Tucks pads. (D's 56.1 Stmt. ¶¶ 39, 40, 44, 45, 48; Harris-Baker Decl. ¶¶ 20(a)-(b), 21; 2019 Miranda Consultation.) Plaintiff does not dispute that Harris-Baker submitted the foregoing prescriptions but claims she "ignored" the course of treatment set at Bellevue, did not implement "[n]early half" of his doctors' recommendations, and provided inadequate amounts of the treatments. (Rizzuto Decl. ¶¶ 10-11.)

But he provides no details that would allow a jury to reach that conclusion without speculating. He does not say what quantities of what medicines he had when he arrived at Woodbourne, when he needed more, what he was not provided and during what periods, what happened during those periods, and how any change in his condition could reasonably be attributed to particular missing items – especially in light of the panoply of medicines he did receive. He provides a list of the medications he requested, (Ex. 1 Grievance at 5-6), but does not attempt to compare that list to what he received or to show that the difference was so significant as to rise to the level of a grave, urgent or extremely painful condition.[16]

Instead, each of Harris-Baker's prescriptions is consistent with Dr. Miranda's recommendations, and deviations from the list were based on circumstances outside of her control or her medical judgment. (*See* AHR Notes and Records at 2-3 (mineral oil denied by RMD because of security risk); Weig Decl. Exs. at 20 (noting Plaintiff was getting ten "more soothing" Tucks pads instead of alcohol pads).) Plaintiff's inability to obtain his preferred treatments, every recommended item in the amounts he requested, or exact substitutes for denied treatments does not give rise to a constitutional violation. *See Fox v. Fischer*, 242 F. App'x 759, 760 (2d Cir. 2007) (summary order) (substitution of one drug for another fails to establish objective prong absent allegation that change caused harm); *Gray v. Kang Lee*, No. 13-CV-258, 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) ("The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; a prisoner does not have the right to

---

[16] The only specific shortfall Plaintiff discusses in his declaration is that he requested twenty alcohol pads per day but received only five, which were insufficient to cover his body. (Rizzuto Decl. ¶ 10.) But alcohol pads were not one of Dr. Miranda's recommendations. (*See* AHR Notes and Records at 61.) The grievance he attaches, like the declaration, is conclusory, with no specifics regarding the alleged differences between what was required and what he received. (*See* Ex. 1 Grievance at 3-10.)

choose his medical treatment as long as he receives adequate treatment."); *Price v. Reilly*, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010) ("Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong.").

Moreover, even assuming that Harris-Baker did not prescribe every treatment recommended by Dr. Miranda and Bellevue, Plaintiff provides no evidence that the difference between the treatment prescribed and the treatment provided caused a sufficiently serious injury. *See Price*, 697 F. Supp. 2d at 359 (objective prong not met where plaintiff did not produce evidence that complained-of medication dosage caused objectively serious harm). "Even if [P]laintiff's skin failed to improve or may have worsened" under Harris-Baker's care, this does not establish a constitutional violation because her care was reasonable. *Rizzuto v. Annucci*, No. 23-CV-515, 2025 WL 2933530, at *12 (N.D.N.Y. Aug. 19, 2025), *report and recommendation adopted in part, rejected in part sub nom. Rizzuto v. Morley*, 2025 WL 2726609 (N.D.N.Y. Sep. 25, 2025). There can be any number of reasons an immune system disorder such as psoriasis can wax or wane, and there is simply no evidence that any worsening Plaintiff experienced was the result of any discrepancy between what the dermatologist recommended and what Plaintiff was provided. Accordingly, Plaintiff has not met the objective prong of the deliberate indifference analysis.[17]

Second, even if the Court were to assume that Plaintiff meets the objective element, he fails to establish the subjective element. To establish deliberate indifference, Plaintiff must demonstrate that Harris-Baker acted with "a mental state equivalent to subjective recklessness, as

---

[17] I need not address the dispute over whether Plaintiff's consumption of allergens caused any exacerbation of his condition. (*Compare* Ds' 56.1 Stmt. ¶¶ 8, 63-64, *with* P's 56.1 Stmt. ¶ 8.) Even if Plaintiff is correct that it did not, the record is nevertheless devoid of evidence that any lapse in care caused Plaintiff's psoriasis to worsen.

the term is used in criminal law" – that is, that she acted or failed to act "while actually aware of a substantial risk that serious inmate harm w[ould] result." *Salahuddin*, 467 F.3d at 280; *see Coke v. Med., Dep't of Corr. & Cmty. Supervision*, No. 17-CV-866, 2018 WL 2041388, at *3 (S.D.N.Y. Apr. 30, 2018) (defendant must act with criminal recklessness or "know[] of and disregard[] an excessive risk" to plaintiff's health or safety). Plaintiff has presented no evidence suggesting Harris-Baker knew of and disregarded an excessive risk to Plaintiff's health. Instead, the undisputed evidence shows that Harris-Baker was attentive and made a concerted effort to provide Plaintiff with his recommended regimen by making a referral, issuing prescriptions and submitting – and at times re-submitting after denial – non-formulary requests for treatments. Moreover, the denial of a treatment such as mineral oil does not imply deliberate indifference on Harris-Baker's part because she had no authority to override the RMD and the denial was due to security concerns. *See Funderburke v. Canfield*, No. 13-CV-6128, 2016 WL 831974, at *8-9 (W.D.N.Y. Feb. 29, 2016) (granting summary judgment for deliberate indifference claim where defendant was unable to order plaintiff a leg brace due to security concerns and decision to deny brace was outside of his control).

The record lacks sufficient evidence from which a reasonable jury could conclude that Harris-Baker's treatment exposed Plaintiff to a serious risk of harm, and it is wholly devoid of evidence that Harris-Baker knew or believed that her regimen would cause such harm. *See Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists and draw the inference). Plaintiff's "disagreement with [the] choice of treatment is not evidence of [Harris-Baker's] deliberate indifference to his condition." *Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (summary order); *see Coke*, 2018 WL 2041388, at *4 ("[A]n inmate's preference

of an alternative treatment, or feeling that he did not get the level of medical attention he desired, does not evidence a sufficiently culpable state of mind.") Plaintiff "was provided with a robust course of treatment that was responsive to his complaints, even if it was not the precise treatment he desired." *Martinez v. Duquin*, No. 20-CV-773, 2024 WL 4680372, at *7 (W.D.N.Y. Nov. 5, 2024). "In light of the overall quantity and quality of treatment and care [Plaintiff] received . . . [he] fails to establish that [Harris-Baker was] subjectively deliberately indifferent to his medical needs." *Patterson v. Westchester Cnty.*, No. 13-CV-194, 2014 WL 1407709, at *9 (S.D.N.Y. Apr. 11, 2014) (collecting cases), *report and recommendation adopted*, 2014 WL 2759072 (S.D.N.Y. June 16, 2014); *see Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016) (summary order) (no deliberate indifference claim where plaintiff received "medicine, various forms of treatment, and diagnostic tests . . .throughout the relevant period of his incarceration"); *Chance*, 143 F.3d at 703 ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). In short, Plaintiff has presented no evidence suggesting that Harris-Baker understood that anything she was or was not doing presented an excessive risk to Plaintiff's health and persisted anyway. As such, a reasonable jury could not find that Plaintiff met the subjective prong necessary to give rise to a constitutional claim against her.

Accordingly, Defendants' motion is granted as to the Eighth Amendment claim against Harris-Baker. Because there is no underlying constitutional violation, Plaintiff's supervisory claims against Weig in connection with his medical treatment also cannot be sustained. *See Lawrence*, 669 F. App'x at 28 (dismissing supervisory liability claim where there was no underlying constitutional violation); *Boykin v. Westchester Cnty. Jail*, No. 22-CV-10513, 2024

WL 4252040, at *12 (S.D.N.Y. Sep. 20, 2024) (same). Thus, the Eighth Amendment claims against Weig are also dismissed.

### B. Eighth Amendment Claim: Conditions of Confinement

To state an Eighth Amendment conditions of confinement claim, "an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020); *see Farmer*, 511 U.S. at 834. A condition of confinement that is objectively "sufficiently serious" is one that "society considers . . . to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *McCray*, 963 F.3d at 120 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.*

#### 1. Superintendent Lilley

Plaintiff claims that Lilley violated his Eighth Amendment rights because he failed to adequately address the condition of the water at Woodbourne. (*See* AC at 13-14.) Specifically, Plaintiff states that the elevated levels of lead, copper and chlorine exacerbated his psoriasis, and the water's pH levels rendered it "borderline undrinkable." (Rizzuto Decl. ¶ 24; *see id.* ¶¶ 21-25.)

As to the objective element, Defendants claim there was no directive advising the facility that the elevated levels of copper and lead made the water unsafe. Plaintiff states, however, that the Water Report indicated that people with immune system disorders may be at a higher risk of infection from drinking the water. (Water Report at 4, 6.) Notably, this is in reference to the

water's safety for drinking, not bathing. Plaintiff nevertheless claims that the water exacerbated his psoriasis symptoms, contending that "[p]soriasis sufferers are particularly [a]ffected by lead in water," and citing Shower Water and Skin Health at 3. (Rizzuto Decl. ¶ 21.)[18] That article states that "[l]ead, iron, and other metals that may appear in the water supply" – not necessarily at elevated levels, apparently – can "trigger or exacerbate" a psoriasis flare-up. (Shower Water and Skin Health at 3.)

"Courts in this Circuit have held that the Eighth Amendment requires that water that is suitable for drinking and bathing be supplied to inmates." *Rivera v. Bloomberg*, No. 11-CV-4325, 2012 WL 3655830, at *4 (S.D.N.Y. Aug. 27, 2012). Although Plaintiff does not need to produce medical expert testimony to support his claim, *see Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994), "[s]peculation and conclusory allegations, unaccompanied by evidentiary support, do not suffice to avoid summary judgment," *DeLeon v. Wright*, No. 10-CV-863, 2012 WL 3264932, at *8 (N.D.N.Y. July 5, 2012), *report and recommendation adopted*, 2012 WL 3264929 (N.D.N.Y. Aug. 9, 2012). Plaintiff has presented one article with a single sentence suggesting psoriasis sufferers may suffer flare-ups from water, but he has presented nothing from which a jury could conclude, without speculating, either that the lead level at Woodbourne made that risk worse or that the water at Woodbourne caused a worsening of *his* condition, let alone that that worsening of an already challenging condition was sufficiently serious. *See Thompson v. Carlsen*, No. 08-CV-965, 2010 WL 3584409, at *8 (N.D.N.Y. Aug. 16, 2010) (granting summary judgment where plaintiff provided no factual or expert support that contaminated water caused him to develop prostate cancer), *report and recommendation adopted*, 2010 WL 3584396 (N.D.N.Y. Sep. 7, 2010); *Moore v. Wright*, No. 05-CV-13, 2008 WL 4186340, at *7 (N.D.N.Y.

[18] *See supra* note 14.

Sep. 10, 2008) (conclusory allegations and information "independently gleaned from a book and medical staff that cannot be identified and were not documented" are insufficient to defeat motion for summary judgment). Viewing the facts in the light most favorable to Plaintiff, there is insufficient evidence to create a triable issue of fact as to the objective element.

Like Plaintiff's claims as to the copper and lead, Plaintiff's claims as to the water's chlorine and pH levels are speculative and "unaccompanied by evidentiary support." *DeLeon*, 2012 WL 3264932, at *8. Plaintiff does not provide test results that indicate the facility's chlorine levels were outside of the normal range. Moreover, Plaintiff does not provide evidence that Woodbourne's pH levels were dangerous to him or anyone else. (*See* Rizzuto Decl. ¶ 24.) *See Wright v. N.Y. State Dep't of Corr. Servs.*, No. 06-CV-3400, 2008 WL 5055660, at *11-12 (S.D.N.Y. Oct. 10, 2008) (noting "conjecture and speculation" about the water's safety does not suffice as competent evidence of water contamination), *report and recommendation adopted*, 2008 WL 5084193 (S.D.N.Y. Nov. 24, 2008), *aff'd*, 372 F. App'x 175 (2d Cir. 2010) (summary order). Indeed, it appears that the average pH level, which according to Plaintiff is ideally 7, was at or above 6.5 during his time at Woodbourne. (Rizzuto Decl. ¶ 24; Water Report at 15-25.)

Even if Plaintiff had met the objective prong, the record does not contain evidence from which a jury could find that Lilley's actions satisfy the subjective prong. There is no evidence that Lilley was in possession of information indicating that the water could seriously exacerbate Plaintiff's psoriasis or otherwise seriously harm him, let alone that he drew such an inference.[19]

---

[19] Plaintiff points to the Water Report's statement that "[i]mmune-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders . . . can be particularly at risk from infections." (Rizzuto Decl. ¶ 23 (citing Water Report at 6).) This general statement, which does not mention psoriasis, and which relates to infections from drinking water, would hardly suffice to inform Lilley that Plaintiff's condition was an immune system disorder, let alone that showering with the water could worsen his condition.

Plaintiff claims that Lilley told inmates that he would not drink the water and posted a notice directing inmates to instead buy water in the commissary. (Rizzuto Decl. ¶ 20; P's Depo. at 41:13-18.) Plaintiff takes issue with the water purchase limit and claims Lilley knew about the Water Report's results on May 9, 2019 and suppressed its findings. (P's Depo. at 99:9-11; P's 56.1 Stmt. ¶ 75.) But the evidence does not support his claims. The Water Report – which contains results reported in January 2020 and states, among other things, that the levels were no longer elevated in December 2019 samples following remedial actions, (Water Report at 5, 29) – could not have been received in 2019. In any event, it indicates that the problematic water samples were from June 2019, (*id.* at 4), and although the record is not clear as to when Lilley was told of the results, by August 7, 2019, he had informed the inmates of the findings at the ILC meeting and described the planned remedial measures, including a new chemical injection system and increased testing procedures. (ILC Meeting Minutes.) Lilley may have personally preferred not to drink the water or advised the inmates to obtain bottled water, but there is no evidence that he was told that the water was unsafe to drink, understood it to be so, or had any inkling that it could seriously worsen a condition like psoriasis. Likewise, there is nothing in the record suggesting that Lilley understood that the chlorine or the pH levels in the water posed any risk to Plaintiff. The record also shows that he took the required action to address the contaminants. (*See* Water Report at 5-6; ILC Meeting Minutes; Lilley Decl. ¶¶ 6, 10.)

Where there is "substantial – and uncontested – evidence" of steps prison officials have taken to respond to reports of polluted water, as there are here, "a factfinder could not reasonably conclude that he was deliberately indifferent to the well-being of inmates." *Bellezza v. Fischer*, No. 05-CV-98, 2006 WL 3019760, at *5 (S.D.N.Y. Oct. 24, 2006); *see Bonano v. Doe*, 628 F. App'x 25, 28 (2d Cir. 2015) (summary order) (granting summary judgment where defendant

received plaintiff's grievance but knew water was treated and tested regularly, delegated management of water to staff and independent contractors, and was not advised the water posed any substantial risk of harm). Therefore, Lilley's actions fail to satisfy the subjective element of deliberate indifference.

Accordingly, Defendants' summary judgment motion as to Lilley relating to the facility's water is granted.[20]

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 79), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: October 22, 2026
White Plains, New York

Cathy Seibel

CATHY SEIBEL, U.S.D.J.

---

[20] Because Defendants did not violate Plaintiff's Eighth Amendment rights, "the Court need not determine whether qualified immunity applies." *Geller v. Hochul*, No. 20-CV-4653, 2021 WL 4392521, at *16 (S.D.N.Y. Sep. 24, 2021), *aff'd in part, appeal dismissed in part*, No. 21-2514-CV, 2023 WL 221725 (2d Cir. Jan. 18, 2023).